UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GENERAL MILLS, INC.,

                Plaintiff,

    -against-

CHAMPION PETFOODS USA, INC. and
MODESTINO MELE,

                Defendants.

Civil Action No.: _____

---

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY

Eric A. Savage, Esq.
Gary Moy, Esq.
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022.3298
212.583.9600

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

PAGE

PRELIMINARY AGREEMENT ..................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 3

    A.    General Mills Background ........................................................................ 3

    B.    Mele's Employment with General Mills ................................................. 4

    C.    Mele's Acceptance of the Non-Compete Provisions ............................. 6

    D.    Mele's Breach of the Agreements ........................................................... 7

ARGUMENT ................................................................................................................. 8

I.    GMI IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION ...................................................................... 8

    A.    GMI Will Suffer Irreparable Harm Absent Injunctive Relief ................ 9

    B.    GMI Has A Likelihood of Success on the Merits and/or Can Demonstrate
a Sufficient Serious Question Going to the Merits to Make Each of Its
Claims Fair Grounds For Litigation ..................................................... 12

        1.    Choice of Law ........................................................................... 12

        2.    Breach of Contract .................................................................... 12

        3.    Breach of Fiduciary Duties ....................................................... 20

        4.    Unfair Competition & Misappropriation of Confidential
Information ............................................................................... 21

        5.    Tortious Interference with Contract .......................................... 21

    C.    A Balancing of the Equities Favors Granting Preliminary Injunctive Relief ...... 22

II.    GMI SHOULD NOT BE REQUIRED TO POST BOND ............................... 23

III.    THE COURT SHOULD GRANT PLAINTIFF'S REQUEST FOR EXPEDITED
DISCOVERY ................................................................................................. 23

CONCLUSION ........................................................................................................... 24

i.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Andino v. Fischer,
   555 F. Supp. 2d 418 (S.D.N.Y. 2008) .......................................................................9

Avaya, Inc. v. Ali,
   No. 12-10660 (DJC), 2012 WL 2888474 (D. Mass. July 13, 2012) ......................14, 17, 18, 20

BDO Seidman v. Hirshberg,
   93 N.Y.2d 382 (1999) ...........................................................................................13

Cardwell v. Thermo Fischer Scientific,
   No. 09 Civ. 7809 (DAB), 2010 WL 3825711, 2010 U.S. Dist. LEXIS 108302
   (S.D.N.Y. Sept. 23, 2010) ....................................................................................16

Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,
   598 F.3d 30 (2d Cir. 2010) ......................................................................................9

COPI of Delaware, Inc. v. Kelly,
   1996 WL 633302 (Del. Ch. Oct. 25, 1996) .............................................................16

In re Coudert Bros. LLP,
   673 F.3d 180 (2d Cir.2012) ...................................................................................12

DAG Jewish Directories, Inc. v. Y & R Media, LLC,
   No. 09 Civ. 7802 (RJH), 2010 WL 46016 (S.D.N.Y. Jan. 7, 2010) ..........................23

Doctor's Assocs., Inc. v. Stuart,
   85 F.3d 975 (2d Cir.1996) .....................................................................................23

Envtl. Servs., Inc. v. Recycle Green Servs., Inc.,
   7 F. Supp. 3d 260 (E.D.N.Y. 2014) ........................................................................21

Estee Lauder Cos. v. Batra,
   430 F. Supp. 2d 158 (S.D.N.Y. 2006) .....................................................................12

Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.,
   922 F. Supp. 2d 435 (S.D.N.Y. 2013), aff'd, 764 F.3d 210 (2d Cir. 2014) ................8

Hough Assocs. v. Hill,
   No. Civ. A. 2385-N, 2007 WL 148751 (Del. Ch. Jan. 17, 2007) .........................19, 20

IBM v. Papermaster,
   No. 08 Civ. 9078 (KMK), 2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008) ...................11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

IDG USA, LLC v. Schupp,
    416 F. App'x 86 (2d Cir. 2011) .............................................................................9

Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.,
    323 F. Supp. 2d 525 (S.D.N.Y. 2004).........................................................10, 15

Marsh USA Inc. v. Schuhreimen,
    183 F. Supp. 3d 529 (S.D.NY. 2016).............................................................23

MasterCard Int'l Inc. v. Nike, Inc.,
    164 F. Supp. 3d 592 (S.D.N.Y. 2016).............................................................13

Mickey's Linen v. Fischer,
    No. 17 C 2154, 2017 WL 3970593 (N.D. Ill. Sept. 8, 2017)....................10, 16

Nebraskaland, Inc. v. Brody,
    No. 09 Civ. 9155 (DAB), 2010 WL 157496 (S.D.N.Y. Jan. 13, 2010)................23

Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm.
    Co.,
    290 F.3d 578 (3d Cir. 2002)............................................................................20

Payment Alliance Int'l, Inc. v. Ferreira,
    530 F. Supp. 2d 477 (S.D.N.Y. 2007)............................................................11

PLC Trenching Co., LLC v. Newton,
    No. 6:11-CV-0515, 2011 WL 13135653 (N.D.N.Y. Dec. 12, 2011) ............20, 21

Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.,
    745 F. Supp. 2d 343 (S.D.N.Y. 2010)............................................................21

Research & Trading Corp. v. Pfuhl,
    Civ. A. No. 12527, 1992 WL 345465 (Del. Ch. Nov. 18, 1992)....................15

Singh v. Batta Environmental Assoc., Inc.,
    No. Civ. A. 19627, 2003 WL 21309115 (Del. Ch. May 21, 2003) ...............9, 19

Ticor Title Ins. Co. v. Cohen,
    173 F.3d 63 (2d Cir. 1999)..........................................................................10

TP Group–CI, Inc. v. Vetecnik,
    No. 16-CV-623 (RGA), 2016 WL 5864030 (D. Del. Oct. 6, 2016) ..............12, 13

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

<u>TriState Courier & Carriage, Inc. v. Berryman</u>,
No. C.A. 20574-NC, 2004 WL 835886 (Del. Ch. Apr. 15, 2004) ................................. *passim*

<u>Uni-World Capital, L.P. v. Preferred Fragrance, Inc.</u>,
73 F. Supp. 3d 209 (S.D.N.Y. 2014) ..................................................................... 10, 12, 19, 23

<u>USI Ins. Servs. LLC v. Miner</u>,
801 F. Supp. 2d 175 (S.D.N.Y. 2011) ................................................................................... 15

<u>Vendavo, Inc. v. Long</u>,
397 F. Supp. 3d 1115 (N.D. Ill. 2019) .................................................................................. 11

<u>Village of Cannon v. Bankers Trust Co.</u>,
920 F. Supp. 2d 520 (S.D.N.Y. 2006) ................................................................................... 12

<u>VLIW Tech, LLC v. Hewlett-Packard Co.</u>,
840 A.2d 606 (Del. 2003) ...................................................................................................... 13

<u>Weichert Co. of Penn. v. Young</u>,
2007 WL 4372823 (Del. Ch. Dec. 7, 2007) ..................................................................... 16, 17

**Other Authorities**

Federal Rules of Civil Procedures 30(b)(6) ............................................................................ 24

Federal Rules of Civil Procedure 65(c) .................................................................................. 23

## PRELIMINARY AGREEMENT

Plaintiff General Mills, Inc. ("GMI") submits this memorandum of law in support of its motion for a temporary restraining order, a preliminary injunction, and expedited discovery, brought by Order to Show Cause.  General Mills seeks to enjoin Defendant Modestino Mele ("Mele"), as well as his current employer Champion Petfoods USA, Inc. ("Champion"), and anyone acting in concert with him, under his supervision, or on his behalf, from violating the non-compete terms of the Release Agreement (the "Release") executed by Mele, as well as the two stock option awards and the two restricted stock unit awards that he accepted, and from engaging in continued tortious conduct.

Specifically, when Mele was separated from his position as Senior Vice President of Global Sales for Blue Buffalo Enterprises, Inc. ("Blue Buffalo") in the summer of 2019, he signed the Release which barred him from working on any "product, brand category, process or service . . on which I worked, or about which I had access to confidential information" in the year prior to his departure. Under the stock option agreements issued in 2018 and 2019 from which he has benefitted, he agreed that for one year after his departure from the company he would not work "on any product, brand category, process or service .. on which [he] worked or about which [he] had access to Confidential Information, in the year immediately preceding my termination. . . and which competes with General Mills' products, brand categories, processes or related services." The two restricted stock unit agreements that he accepted, also in 2018 and in 2019, contain the same non-compete language and, like the stock option agreements, bar him from disclosing or using any GMI confidential materials.

Despite these unambiguous provisions, following his termination from Blue Buffalo, where he had served as Senior Vice President of Global Sales, Mele joined GMI's direct competitor Champion. Based on the announcement issued by Champion on January 8, 2020, he

has been charged with improving the sales of the two Champion brands for which he headed GMI's competitive efforts. It is hard to imagine a clearer violation of his specific and unambiguous non-compete undertakings.

As discussed below, the two companies are direct rivals in the field of high-quality specialty premium pet foods, and Mele had been instrumental in leading the response to Champion's challenge to Blue Buffalo's Wilderness line of dog food. These efforts included developing a new line of food under the Carnivora brand name with the specific goal of responding to Champion's product launch of the Orijen and Acana brands. Not only did Mele help lead Blue Buffalo's response to Champion, but he had access to information which was available only to the senior leadership of Blue Buffalo and vendors or customers who agreed to hold the material in confidence. This material included Blue Buffalo's business and business relationships, customer preferences, marketing and pricing strategies, product innovations, and other proprietary information.

GMI has not consented to Mele's joining its competitor where, based on Champion's announcement, he will be working on the types of products and brand categories on which he worked for three years at Blue Buffalo. GMI is legitimately concerned that Champion's access to GMI's confidential and proprietary information, through its employment of Mele, will provide insight to Champion on how best to counter GMI and inflict immeasurable and irreparable harm to its business.

GMI is entitled to an order barring Mele from working for Champion and preventing Champion from employing Mele for the year as specified in the Release and the stock option and restricted stock unit awards that he accepted. Absent a restraining order, GMI has suffered and will continue to suffer irreparable harm in the form of lost customer and business relationships,

2

goodwill, and other irreparable injury for which there is no adequate monetary remedy. GMI therefore requests that the Court grant the motion for a temporary restraining order, preliminary injunction, and expedited discovery.

**STATEMENT OF FACTS**[1]

**A.     General Mills Background**

In or about April 2018, GMI, a leading manufacturer of branded consumer food products, acquired Blue Buffalo, a company founded in 2002 which, at the time of the acquisition, had established itself as one of the country's leading manufacturers and distributors of high-quality specialty premium pet foods. To do so, it had developed and refined its marketing strategies and pursued new and multiple sales channels for its products, including neighborhood pet stores, pet specialty stores such as PetSmart and Petco, e-commerce, international, and a channel known as Food, Drug and Mass Merchandise market ("FDM"). The FDM channel includes supermarkets, chain drug stores and large mass-retailers such as WalMart and Target.

The process of identifying sales channels is a long-term process which involved consideration of sales and marketing strategies for the Blue Buffalo brands and included market analyses, product review, development of advertising materials and contacts with retailers and distributors. These efforts generated a substantial amount of information and materials that Blue Buffalo, and GMI as its parent company, consider to be highly confidential and proprietary, and are limited in distribution and access. Only relevant employees of Blue Buffalo and GMI and vendors who agree to maintain the confidentiality of such information and documents are allowed to have access.

---

[1]     The facts are set forth in full in the accompanying Declarations of Tom Morton, Rick Budney, Lynne Harris and Eric A. Savage.

Champion is a direct rival of Blue Buffalo. It sells its dry dog food under various brand names, including the brands "Orijen" and "Acana". These brands, which have been in use in the United States for approximately ten years, represent a significant competitive force to Blue Buffalo's products.

## B.  Mele's Employment with General Mills

Mele joined Blue Buffalo in 2016 as Senior Vice President of Sales for North America. In 2018, he was named as Senior Vice President of Global Sales, overseeing all sales teams other than the veterinary channel. His principal responsibility was to expand Blue Buffalo's distribution channels and develop and implement the company's commercial strategy as it evolved from a heavily focused pet specialty channel strategy to an expanded multi-channel selling company. This included, among other things, building and leading the sales organization, developing financial budgets and business plans, and working with customers to understand their business needs while developing differentiated strategies for various sales channels.

As a result, Mele came to know virtually all of Blue Buffalo's sales accounts, sales terms for those accounts, key personnel at those accounts and the details of each customer relationship. He was able to share with those customers Blue Buffalo's business plans and was very familiar with the regulatory and legal environment in which the company and its customers operated. Mele oversaw a sales staff of approximately 300 people, and was also fully familiar with Blue Buffalo's supply chain as well as its plans for product innovation and plans for future growth.

The information, strategic thinking, marketing plans and the like is highly sensitive and distributed on a need-to-know basis, both within Blue Buffalo and its suppliers and customers. Mele had virtually unlimited access to Blue Buffalo's confidential business information regarding the development, marketing, roll-out and manufacturing of Blue Buffalo products and marketing plans:

in fact, he not only had access to this information and strategic thinking, he was instrumental in its development.

As of 2007, one of Blue Buffalo's main line of premium dog food was under the brand name Wilderness, which was marked by its high-protein, high meat and grain-free composition.  It was highly successful.  It was one of the first high-protein product lines of its kind to develop a national market, primarily through pet specialty stores, generating approximately $410 million in sales per year in the pet specialty and neighborhood pet channels, about one-third of Blue Buffalo's annual income in those channels.  Champion responded by developing products and brands that it claimed were also high-protein, high meat products and by targeting Wilderness foods as its key competitor and main source of volume, as illustrated by its sales materials and retail strategies.  The goods were sold under the names Orijen and Acana and proved initially successful, warranting a commercial response by Blue Buffalo.

Thus, in approximately May 2017, Blue Buffalo began a plan to introduce another competitive offering against Champion's Orijen and Acana brands, a project which took the name "Wild Prey".  Ultimately, with Mele's involvement and strategic direction, Blue Buffalo developed a new brand, Carnivora, to be sold into the pet specialty stores.  This project required detailed analyses of the composition and formulas of the Orijen and Acana products and studies of the marketing strategies and sales information regarding the brands to determine how it could best offer competing products.  The development, implementation and ultimately, the successful growth of the Carnivora product line depended --- and still depends --- upon a large body of confidential information that is not available to persons outside of GMI.

Mele became involved in the Wild Prey project in or about June 2017.  From that time until he left the company, he was regularly involved in meetings, communications, and other efforts with

Blue Buffalo's leaders to develop the marketing strategy for Blue Buffalo's competing products. Throughout the development and ultimate launch of the Carnivora line as a new entry in the premium dog food sector, Mele remained involved in the development and refinement of marketing and advertising strategies, as well as working on ways to generate and increase sales channels for Carnivora. In fact, Carnivora is positioned to be highly competitive with Champion's Orijen and Arcana brands in terms of sales.

## C.   Mele's Acceptance of the Non-Compete Provisions

In or about the summer of 2019, GMI decided to terminate Mele's employment. Thus, on about August 1, 2019, in connection with his separation, Mele executed a Release Agreement (the "Release") by which he agreed, in consideration for certain benefits that GMI was not otherwise required to provide him, "For one year after August 1, 2019, I will not work on any product, brand category, process or service (a) on which I worked, or about which I had access to confidential information by virtue of my role, in the year immediately preceding my last day of active employment with GMI, and (b) which competes with GMI's products, brand categories, processes or related services."

Moreover, Mele also agreed to restrictions in connection with his post-employment activities when he was offered, and accepted stock option awards which provided, at Section 6(b), "I agree that for one year after I leave the Company, including retirement from the Company, I will not work on any product, brand category, process, or service: (i) on which I worked, or about which I had access to Confidential Information[2], in the year immediately preceding my termination (including

---

[2]     The stock option agreements and the restricted stock unit agreements define Confidential Information "any non-public information I create, receive, use or observe in the performance of my job at General Mills. Examples of Confidential Information include marketing, merchandising, business plans, business methods, pricing, purchasing, licensing, contracts, employee, supplier or customer information, financial data, technological development, manufacturing processes and process specifications, product formulas, ingredient specifications, software code, and all other proprietary information which is not publicly available to others.

retirement) from General Mills, and (ii) which competes with General Mills products, brand categories, processes, or related services." Further, these documents provide that if Mele breached his obligations under that document GMI would be entitled to seek several remedies, including "injunctive relief and/or any other legal or legal or equitable remedies available under applicable law."

The restricted stock unit agreements that he accepted and from which he benefitted, provide the same non-compete language in Section 7(b) and also make clear, at Section 7(a), that he is barred from using any confidential information of GMI. Thus, Mele is subject to explicit non-compete provisions under <u>five</u> separate documents --- the Release, the two stock option awards and the two restricted stock unit awards.

As described above, the premium pet food industry, in which both GMI and Champion are engaged, is highly competitive. If Champion were to have access to GMI's confidential and proprietary information concerning product development, marketing strategies and sales channels, that could have devastating effects. Champion has increased its market share in this category since its introduction of Orijen and Acana and having someone like Mele on its team would represent a major asset to Champion's efforts to try catch up to and seek to surpass Blue Buffalo. Indeed, the development, implementation and ultimately the successful growth of the Carnivora product line and the defense of the Wilderness brand line, depended and still depends on a large body of confidential information not available to persons outside GMI.

**D.     Mele's Breach of the Agreements**

On or about November 5, 2019, Mele advised GMI that he had been offered a position by Champion. By announcement dated January 8, 2020, Champion confirmed that Mele had been hired as the company's Chief Customer Officer and would be focused on "returning our brands to growth . . . providing you with the high level of service, sales and marketing tools required to help

you grow your business, as we continue to drive our strong growth agenda for ORIJEN and ACANA".

Thus, despite the non-compete provisions contained in the Release, the two stock option grants and the two restricted stock unit awards which continue by their terms to run until July 31, 2020. Mele's employment at a direct rival to Blue Buffalo places him in a position where he will be providing assistance to Champion in connection with the very Orijen and Acana brands for which he led GMI's response and with which the GMI's Carnivora and Wilderness brands compete. In addition, it places him in a position in which GMI's confidential information will inevitably be disclosed to Champion. GMI has not consented and does not consent to Mele's unilateral shortening of his restricted period or violation of the five non-compete provisions to which he agreed.

In the view of GMI, if Mele is allowed to continue with employment with Champion in violation of the Release, the stock option grants and the restricted stock unit awards, it will cause irreparable harm to GMI. Once lost, GMI's trade secrets cannot be restored. The nature of the losses that would be caused over time if GMI's trade secrets and confidential information were disclosed to Champion or used to help it in competing with GMI and /or developing a competing business, cannot be fully quantified or fully measured.

## ARGUMENT

I.  GMI IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND
    PRELIMINARY INJUNCTION

A plaintiff seeking a preliminary injunction "must establish: '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" Goldman, Sachs & Co. v. Golden Empire Sch. Fin.

Auth., 922 F. Supp. 2d 435, 439 (S.D.N.Y. 2013), aff'd, 764 F.3d 210 (2d Cir. 2014) (citing Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010)). The same standard applies to an application for a temporary restraining order. See Andino v. Fischer, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) ("It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction.").

Applying this standard, the temporary restraining order that GMI seeks is both necessary and proper to preserve the status quo and the ability to grant effective, meaningful relief after a determination of the merits of the case. GMI is entitled to injunctive relief to prevent it from continuing to suffer irreparable harm at the hands of its former Senior Vice President of Global Sales.

A.    **GMI Will Suffer Irreparable Harm Absent Injunctive Relief**

"To establish irreparable harm, a plaintiff must establish both that an injury is likely absent the injunction and that the injury cannot be adequately remedied with money damages." IDG USA, LLC v. Schupp, 416 F. App'x 86, 88 (2d Cir. 2011). Courts have routinely found that irreparable harm flows from a former employee's breach of a restrictive covenant. See Singh v. Batta Environmental Assoc., Inc., No. Civ. A. 19627, 2003 WL 21309115, at *9 (Del. Ch. May 21, 2003) (finding that damages are nearly impossible to calculate with any certainty when a party is allowed to continue to breach his non-compete agreement); see also TriState Courier & Carriage, Inc. v. Berryman, No. C.A. 20574-NC, 2004 WL 835886, at *13 n.147 (Del. Ch. Apr. 15, 2004) ("The harms resulting from competition by someone bound by a noncompetition agreement are frequently found to be irreparable."). Similarly, GMI will suffer irreparable harm without injunctive relief.

If Mele is allowed to continue his employment at Champion, it is impossible to believe that he will not be working on products, brand categories, processes or services on which he worked,

9

or as to which he had access to confidential information during his last year of employment at GMI. Indeed, the front page of Champion's website - https://www.championpetfoods.com/en-us/ - (Exhibit A) lists only two brands, Orijen and Acana, and Mele devoted time and effort at GMI to thwarting the challenge that those brands posed to Blue Buffalo products.   Champion's announcement of January 8, 2020 only confirms that fear.

Absent a restraining Order, Mele and Champion will be able to use GMI's own confidential information against it, which will cause GMI to lose business and customer goodwill.   Mele's violation of the Release, the stock option grants and the restricted stock unit awards "threaten to cause [General Mills] irreparable harm by luring away the business of a number of long-term [General Mills] clients." Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc., 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004).  Indeed, it is well-settled that the loss of "future sales, goodwill and entire client accounts" cannot be easily quantified. Uni-World Capital, L.P. v. Preferred Fragrance, Inc., 73 F. Supp. 3d 209, 236 (S.D.N.Y. 2014) (noting that the loss of client relationships and good will can only be remedied by monetary damages in unusual circumstances); Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999) ("it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come"); see also Mickey's Linen v. Fischer, No. 17 C 2154, 2017 WL 3970593, at *18 (N.D. Ill. Sept. 8, 2017) (it is "precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'").

As Blue Buffalo's Senior Vice President of Global Sales, Mele was intimately involved in soliciting customers, securing business relationships, and developing and marketing Blue Buffalo's products, including formulating strategies to respond to direct competitors, such as his current employer Champion.  Both Blue Buffalo and Champion have developed products and

brands in the highly competitive premium pet foods market segment. By joining Champion, Mele is servicing GMI's direct competitor; it is highly foreseeable, if not inevitable, that he has used and/or will use GMI's confidential information to counter the very products that he helped launch and whose sales and marketing initiatives he helped formulate and direct.

Through its employment of Mele, who was involved in the development and marketing of Blue Buffalo products to challenge specific Champion product categories, Champion has access to and Mele inevitably will use confidential information about Blue Buffalo's products and future product development, as well as Blue Buffalo's market research and past and present business plans to respond to competitors and secure business relationships. This will erode the market advantage that GMI and Blue Buffalo developed through considerable investment of time, effort, and money. Cf. Vendavo, Inc. v. Long, 397 F. Supp. 3d 1115, 1142 (N.D. Ill. 2019) (noting that if former employee is allowed to use "even the information in [his] head" that is based on former employer's confidential information, new employer will have an "unfair advantage by avoiding the costly process of actually discovering" this information).

As such, Champion and Mele have placed themselves in an unfair, advantageous position to challenge and harm GMI's business, all in violation of the Release, the stock option grants and the restricted stock unit awards. See IBM v. Papermaster, No. 08 Civ. 9078 (KMK), 2008 WL 4974508, at *8 (S.D.N.Y. Nov. 21, 2008) ("Because [defendant] has been inculcated with some of IBM's most sensitive and close-guarded technical and strategic secrets, it is no great leap for the Court to find that Plaintiff has met its burden of showing a likelihood of irreparable harm."); Payment Alliance Int'l, Inc. v. Ferreira, 530 F. Supp. 2d 477, 482 (S.D.N.Y. 2007) ("[E]ven if [defendant] acted with the best of intentions, he may unintentionally transmit information gained through his [former employment] during his day to day contact with his new employer.")

(quotation omitted); Estee Lauder Cos. v. Batra, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) ("Even where a trade secret has not been disclosed, irreparable harm may be found based upon a finding that trade secrets will inevitably be disclosed, where ... the movant competes directly with the prospective employer and the transient employee possesses highly confidential or technical knowledge concerning [] marketing strategies, or the like.").

As a result of Mele's conduct, GMI is likely to lose customer and business relationships and the goodwill built up over the years, neither of which can be measured with monetary damages. See e.g., Uni-World Capital, 73 F. Supp. 3d at 236.

**B.   GMI Has A Likelihood of Success on the Merits and/or Can Demonstrate a Sufficient Serious Question Going to the Merits to Make Each of Its Claims Fair Grounds For Litigation**

**1.   Choice of Law**

"When a federal district court sits in diversity, it generally applies the law of the state in which it sits, including that state's choice of law rules." In re Coudert Bros. LLP, 673 F.3d 180, 186 (2d Cir.2012). New York courts generally honor choice of law provisions. See Village of Cannon v. Bankers Trust Co., 920 F. Supp. 2d 520, 526 (S.D.NY. 2006). At the outset, Section16 of the stock option agreements and Section 19 of the restricted stock unit agreements provide that "this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware". The Release is silent about the applicable law, but the outcome is the same regardless whether Delaware or New York law applies.

**2.   Breach of Contract**

The Release, the stock option grants and the restricted stock unit awards are fully and properly enforceable and are the subject of clear violations by Mele. Under Delaware law, a party moving for injunctive relief based on a breach of restrictive covenants must show evidence of a breach and the enforceability of the covenants. See TP Group–CI, Inc. v. Vetecnik, No. 16-CV-

12

623 (RGA), 2016 WL 5864030, at *2 (D. Del. Oct. 6, 2016).  To be enforceable, restrictive covenants "must (1) meet general contract law requirements, (2) be reasonable in scope and duration, (3) advance a legitimate economic interest of the party enforcing the covenant, and (4) survive a balance of the equities." Id. (quoting Tristate Courier, 2004 WL 835886, at *10).

New York courts apply a "three-part test to determine the reasonableness, and ultimately the enforceability, of anti-competitive employee agreements." MasterCard Int'l Inc. v. Nike, Inc., 164 F. Supp. 3d 592, 601 (S.D.N.Y. 2016) (citing BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 388–89 (1999)).  Under that test, "[a] restraint is reasonable only if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." Id.  The restrictive covenants at issue easily satisfy these tests.

### a.  Mele Breached His Agreements

Under Delaware law, the elements of a breach of contract claim are "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." VLIW Tech, LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003).  There are five express, enforceable agreements in this case that prohibit Mele from engaging in certain activities in competition with GMI.

GMI likely will be able to establish that Mele breached the Release, the stock option grants and the restricted stock unit awards.  Mele is working for a direct competitor, which similarly develops and markets premium pet foods.  While at Blue Buffalo, Mele participated in discussions and had access to GMI's proprietary information which identified Champion's signature brands as direct competition to Blue Buffalo products.  Blue Buffalo and Champion compete for access to the same sales channels in the same pet foods segment.  As Senior Vice

President of Global Sales, Mele was involved in developing relationships with retailers necessary to expand customer visibility of and access to Blue Buffalo products.  In that role for GMI, he had full access to documents, strategies, market research, information and other non-public material about Blue Buffalo products, which he used with prospective business partners to distinguish Blue Buffalo from Champion and other competitors.

As an employee of Champion, Mele will be performing the same or similar job duties, calling upon the same customers and business contacts, and competing in the same locations in which he formerly worked for GMI.  Mele inevitably will rely on information developed and acquired at Blue Buffalo to parry his former employer's pitches to prospective customers and use that information to compete against Blue Buffalo, with full insight into Blue Buffalo's products and product pipeline, marketing strategies, and business plans.

### b.    The Agreements Are Enforceable

#### (1)    The Agreements are Enforceable Under General Contract Law

Mele assented to be bound by the agreements, and there is no question that the agreements were supported by adequate consideration.  In exchange for Mele's promises in the stock option grants and the restricted stock unit awards, including the covenant not to compete, GMI granted Mele an option to acquire shares of the Company's stock and issued restricted stock units.  These stock options, which he exercised to considerable financial advantage, and the stock units (some of which he still owns) constitute adequate consideration.  See Avaya, Inc. v. Ali, No. 12-10660 (DJC), 2012 WL 2888474 (D. Mass. July 13, 2012) (applying Delaware law and finding that a stock option agreement containing a non-compete clause was enforceable).  Further, in exchange for Mele's promises in the Release, GMI gave Mele post-termination transition support, including his base salary for almost a quarter of the year and medical benefits.  The agreements are therefore

14

enforceable under general contract requirements. See Research & Trading Corp. v. Pfuhl, Civ. A. No. 12527, 1992 WL 345465, at *9 (Del. Ch. Nov. 18, 1992) (finding that agreements containing restrictive covenants were enforceable because the defendants assented to them and they were supported by adequate consideration).

### (2) The Agreements Protect GMI's Legitimate Business Interest

The protection of customer goodwill and confidential information has "long been recognized as [a] legitimate economic interest[]" of a former employer attempting to enforce a restrictive covenant. TriState Courier, 2004 WL 835886, at *10; see also Research & Trading Corp., 1992 WL 345465, at *12 (stating that "[i]nterests which the law has recognized as legitimate include protection of employer goodwill and protection of employer confidential information from misuse."). An employer "has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment." USI Ins. Servs. LLC v. Miner, 801 F. Supp. 2d 175, 187-88 (S.D.N.Y. 2011).

There can be no dispute that GMI has a legitimate interest in protecting its products and customer and business relationships in which Mele was involved during his employment, as well as the company's confidential information relating to those products and relationships. This is particularly true regarding products and plans designed to respond to Champion's Acana and Orijen brands, which was a significant portion of Mele's charge during his employ. Mele's efforts to promote GMI's products and to develop, maintain, and grow business relations using proprietary information created were financed and supported by GMI. See Johnson Controls, 323 F. Supp. 2d at 536 (plaintiff had a legitimate interest in protecting client relationships that were developed by

defendants in connection with their employment). Champion's access to this information through Mele poses a grave commercial threat to GMI.

(3)    **The Agreements Are Reasonable in Scope and Duration**

Moreover, the Release, the stock option grants and the restricted stock unit awards are narrowly tailored to cover only work on products, brand categories, processes or services: (1) on which Mele worked; and (2) that compete with GMI's products, brand categories, processes, or services; and (3) for a period of *only* one year. As such, these agreements do not prevent Mele from being gainfully employed or from working in his profession for any other employer which does not compete with GMI as defined above. Mele remains free to engage in a wide array of business activity, so long as it is outside the scope of the two agreements which bind him for only one year.

In other words, Mele is not being subjected to an undue hardship which would impede this Court from issuing an appropriate restraining order. See Weichert Co. of Penn. v. Young, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007) (stating that "[c]ovenants of two-years' duration are consistently held to be reasonable"); COPI of Delaware, Inc. v. Kelly, 1996 WL 633302, at *5 (Del. Ch. Oct. 25, 1996) (two-year restriction reasonable for company officers and sales personnel); see also Cardwell v. Thermo Fischer Scientific, No. 09 Civ. 7809 (DAB), 2010 WL 3825711, at *7, 2010 U.S. Dist. LEXIS 108302 (S.D.N.Y. Sept. 23, 2010) ("Given that [employee] was a project manager and employer for over four years with [employer], a one year restriction is reasonable under the circumstances" where employer was "engaged in the business of development, manufacture, sales and marketing" and employee "would be privy to an abundance of information about [employer]")); Mickey's Linen, 2017 WL 3970593, at *15-16 (finding reasonable eighteen months covenant that prohibited former employee from soliciting business from customers with whom he formerly worked; covenant protects former employer's legitimate

16

interest in its "customers relationships and confidential information" and caused no undue hardship to employee or public because employee was able to work in his chosen field).

Further, the geographic scope of post-employment restriction is reasonable to the extent it is necessary to protect a party's legitimate interests. "[T]he reasonableness of a covenant's scope is not determined by reference to physical distances, but by reference to the area in which a covenantee has an interest the covenants are designed to protect." Weichert Co., 2007 WL 4372823, at *4.   Delaware law therefore "condones broad geographic restrictions, up to and including non-competes with a global scope . . . when the relevant competitive market is equally broad or global." Avaya, Inc. v. Ali, 2012 WL 2888474, at *7; see also TriState Courier, 2004 WL 835886, at *11 (finding reasonable a two-year restriction prohibiting the defendant from soliciting customers and engaging in competitive activity anywhere that the plaintiff did business).

GMI requests that Mele be prohibited from participating in any business of Champion anywhere in which GMI conducted business before the date of his employment with Blue Buffalo or GMI. Further, the non-disclosure provisions prohibit Mele from using or disclosing confidential information for any purpose outside his employment with GMI, and as such they are designed to protect GMI's non-public information and customer goodwill, both of which are legitimate business interests.

Specifically, while employed by GMI, Mele oversaw all sales teams in North America (with the exception of the veterinary channel) for Blue Buffalo. His sales territory was unrestricted as he was responsible for expanding GMI's distribution channel and developing and implementing the company's sales strategy. As such, Mele had responsibility for all sales accounts and customer relationships throughout the United States. In more than three years working for GMI and Blue Buffalo, Mele played an integral role in developing and marketing their products and cultivating

17

business relationships, as well as studying competitors to develop responses and strategies to maintain and enhance the company's market position.

By virtue of his senior position, Mele had unfettered access to information pertaining to, and/or participated in the development of, GMI and Blue Buffalo products and products in development, business and marketing plans (including the company's current three-year operating plans), and details of each sales account and customer relationship. Due to this intimate involvement, Mele has knowledge of the strengths and weakness of GMI's products and plans -- and, as such, has the ability to use such information against GMI in the service of Champion.

Champion has increased its market share in the premium pet food category since its introduction of Orijen and Acana brands. For it to add Mele to its team – with access to GMI's confidential information and insight into its plans and strategies to counteract Champion – would represent a major asset as Champion tries to catch up to or surpass GMI and Blue Buffalo. Under these circumstances, "it is difficult to conceive how all of the information stored in [defendant]'s memory can be set aside as he applies himself to a competitor's business and its products," and, "[o]n the contrary, what [defendant] knows about [plaintiff] is bound to influence what he does for [his new employer]." Avaya, 2012 WL 2888474 at *7. Accordingly, because the scope of the agreements is tailored to protect GMI's legitimate business interests and covers the relevant competitive market where it does business, the restrictions are fully enforceable and provide a justifiable basis for injunctive relief.

(4) **Balancing of the Equities Favors Enforcement of the Restrictive Covenants**

The potential harm to GMI is great if the Court were to decline its request for injunctive relief. Solely because of his employment with GMI and Blue Buffalo, Mele is able to interfere with their business relationships and opportunities, as well as unfairly damage the their competitive

18

position, for the very reason that he had access to confidential and/or other proprietary and business-sensitive information, as well as access to customer and business relationships.

By contrast, the potential harm to Mele and Champion is minimal. Mele is and will remain free to work on products which do not conflict with Blue Buffalo and has the opportunity to work at any number of companies where his work would not implicate GMI's confidential information. GMI is simply trying to protect itself from having its investment in Mele being used to its detriment, *i.e.*, to protect its legitimate business interests. Enjoining Defendants from unfairly competing with GMI will not prevent Mele from working and Champion can certainly compete in the premium pet food category against GMI as it did before Mele joined in December 2019.

Accordingly, the irreparable injury that GMI will sustain absent an award of injunctive relief far outweighs any possible harm to Defendants. See Singh, 2003 WL 21309115, at *9 (finding that the balance of the equities favored an injunction where former employer would suffer irreparable harm without injunctive relief and the restrictions would not prevent defendant from working altogether); Hough Assocs. v. Hill, No. Civ. A. 2385-N, 2007 WL 148751, at *19 (Del. Ch. Jan. 17, 2007) (finding that the costs to the former employee who breached his non-compete agreement, including a brief layoff from his new job, did not "weigh heavily on the equity scale" where employee could still find other employment in his profession).

### c.   Granting Injunctive Relief is in the Public Interest

Enforcing the agreements at issue in this case will not harm the public. In fact, "[i]f anything, the public interest would be advanced by such an injunction, because, on the facts here, such an injunction would tend to encourage parties to abide by their agreements." Uni-World, 73 F. Supp. 3d at 237. By granting GMI's motion for a temporary restraining order, this Court would further the vital public interest in the integrity and enforceability of contracts and the promotion

19

of business ethics.  Denying injunctive relief essentially rewards Mele's breach of contract and unlawful activity.

If the public has any interest in the issues surrounding the present case, it lies in preserving the enforceability of contracts.  See Hough Assocs., 2007 WL 148751, at *18 (finding that enforcing a non-competition agreement on its plain terms is necessary "to uphold [Delaware's] respect for private contracts"); see also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 597 (3d Cir. 2002) (where the plaintiff has shown a strong likelihood of success on the merits, the public interest favors granting an injunction).  Here, the public's interest includes, "protecting trade secrets and customer goodwill and ensuring that legally enforceable contracts are in fact enforced."  Avaya, 2012 WL 2888474 at *9.  Granting the requested injunctive relief fulfills the public's expectation that the terms of contracts will be enforced and that confidential information and customer goodwill will be protected.  Denying the relief sought can only frustrate those legitimate expectations.  Accordingly, the public interest favors the granting of the relief sought herein.

Further, the restrictive covenants in this case would not restrain competition; Champion actively developed and marketed products in the premium pet foods market segment long before its employment of Mele and it will be able to continue doing so without employing Mele – for one year – in products and brand categories on which he worked at GMI.

### 3.   Breach of Fiduciary Duties

Employees owe their employers a fiduciary duty of loyalty, including a duty not to use or disclose the employer's confidential information for the purpose of competing with the employer.  See PLC Trenching Co., LLC v. Newton, No. 6:11-CV-0515, 2011 WL 13135653, at *9 (N.D.N.Y. Dec. 12, 2011).  As set forth above *supra*, Mele owed GMI a fiduciary duty of loyalty not to disclose its confidential information for the purpose of competing with GMI.  Mele

20

breached and/or is threatening to breach his duty by providing information that GMI and Blue Buffalo treat as confidential to a competitor for purposes of developing products and business plans and securing business for his new employer. Accordingly, GMI has a likelihood of success on the merits of its breach of fiduciary duty claim.

### 4.    Unfair Competition & Misappropriation of Confidential Information

To state an unfair-competition claim on a theory of misappropriation, a plaintiff must allege that the defendant: "(1) misappropriated and used, (2) the plaintiff's property, (3) to compete against the plaintiff's own use of the same property." See PLC Trenching Co., 2011 WL 13135653, at *9. Similarly, "[t]o state a claim for misappropriation of confidential information, a plaintiff must allege that the defendant used the plaintiff's confidential information for the purpose of securing a competitive advantage." Reed Const. Data Inc. v. McGraw-Hill Cos., Inc., 745 F. Supp. 2d 343, 352 (S.D.N.Y. 2010). For similar reasons set forth above, GMI has a likelihood of success on the merits of its misappropriation of confidential information claim insofar as Defendants are in possession of GMI's confidential information concerning its marketing, business plans, pricing methods, products and product development, product roll out, customers, and business relationships and have or will use such information to unfairly compete with GMI.,

### 5.    Tortious Interference with Contract

To prevail on its claim against Champion for tortious interference with contract, GMI must demonstrate: (1) the existence of valid contracts between GMI and Mele, (2) Champion's knowledge of those contracts, (3) Champion's procurement of Mele's breaches of those contracts, and (4) damages. See Envtl. Servs., Inc. v. Recycle Green Servs., Inc., 7 F. Supp. 3d 260, 276 (E.D.N.Y. 2014); see also Tristate Courier, 2004 WL 835886, at *12 (tortious interference with contract requires showing (1) "that there is a contract which the defendant was aware of"; (2) "an

intentional act by the defendant that is a significant factor in causing the breach of that contract";

and (3) that such act was committed "without justification" and caused injury).

GMI has proven each of these elements. First, and as demonstrated in Section B(2)(b), Mele's agreements are valid and enforceable contracts. Second, Champion is aware that Mele is subject to post-employment restrictions (Savage Dec. Ex. A). Third, notwithstanding its knowledge of the restrictions, Champion rebuffed GMI, persisted with employing Mele, and allowed Mele to work on products and brand categories on which Mele previously worked and obtained confidential information at GMI. See Tristate Courier, 2004 WL 835886, at *12 ("[Defendant] and its principals had full knowledge of the restrictions imposed on [former employee] by the Covenant, yet they actively sought out (and took advantage of) [former employee]'s assistance in starting a company to compete with [plaintiff] and to solicit [plaintiff's] customers. These actions can neither be justified nor countenanced.").

### C.   A Balancing of the Equities Favors Granting Preliminary Injunctive Relief

GMI has demonstrated a likelihood of success on the merits for each of its claims. However, even if the Court were to find that GMI had only raised "sufficiently serious questions going to the merits of each claim", the Court should still issue the requested temporary restraining order and preliminary injunction because a balance of the equities tips in favor of GMI. By this filing, GMI seeks to maintain the status quo and prevent Mele from breaching his contractual obligations and fiduciary duties and from engaging in tortious and unfair business practices. The post-employment restrictions on Mele are reasonable and narrowly tailored. The agreements do not prevent Mele from working in his profession. Nor do the agreements prevent Champion from engaging in business – as it had before employing Mele – in a manner that fairly competes with GMI.

On the other hand, if the Court were to deny the request for immediate equitable relief, Defendants will be allowed to unfairly compete with GMI using GMI's own confidential information and thereby undermining the investment of substantial time, resources, and goodwill that GMI developed in its customer and business relationships. As such, the balance of the equities decidedly weight in favor of GMI. See Marsh USA Inc. v. Schuhreimen, 183 F. Supp. 3d 529, 536-37 (S.D.NY. 2016) (granting preliminary injunction and observing that the defendant was unlikely to suffer "great hardship" if he was prevented for one year from soliciting" the plaintiffs' clients, and further observing that plaintiff could have "face[d] the prospect of losing business to a major competitor, transported by a high-level company official").

## II.    GMI SHOULD NOT BE REQUIRED TO POST BOND

Rule 65(c) of the Federal Rules of Civil Procedure confers on the Court broad discretion to the court to set the amount of the bond or even dispense with the bond altogether. See Doctor's Assocs., Inc. v. Stuart, 85 F.3d 975, 985 (2d Cir.1996). In cases where the non-movant has not shown a likelihood of harm, the court may properly set no bond. See id. at 985. In this case, neither Mele nor Champion can establish that they will be harmed if a bond is not posted. The requested relief will not prevent Mele from earning a livelihood and will not prevent Champion from operating its business.

## III.    THE COURT SHOULD GRANT PLAINTIFF'S REQUEST FOR EXPEDITED DISCOVERY

Courts in this district have often granted expedited discovery in cases involving restrictive covenants. See, e.g., Uni-World Capital, 43 F. Supp. 3d at 241 (expedited discovery permitted in non-compete case); Nebraskaland, Inc. v. Brody, No. 09 Civ. 9155 (DAB), 2010 WL 157496, at *1 (S.D.N.Y. Jan. 13, 2010) (expedited discovery permitted in restrictive covenant case involving solicitation of customers); DAG Jewish Directories, Inc. v. Y & R Media, LLC, No. 09 Civ 7802

(RJH), 2010 WL 46016, at *1 (S.D.N.Y. Jan. 7, 2010) (expedited discovery granted in conjunction with a preliminary injunction).

Here, GMI seeks the prompt deposition of Mele, a deposition of Champion pursuant to FRCP 30(b)(6) concerning the recruitment and hiring of Mele and the nature of his work at Champion and the production of limited documents. The production should include all communications between Mele and anyone acting in concert with him or on his behalf and any GMI customer with whom Mele worked or with whom Mele shared and/or obtained confidential information during his employment. Only Meles knows the full extent of his activities in violation of the Release, the stock option grants and the restricted stock unit awards and it will be impossible for GMI to ascertain the full extent of Mele's misconduct without deposition testimony and document production.

## CONCLUSION

For the foregoing reasons, Plaintiff General Mills, Inc. respectfully requests that the Court grant its motion for a temporary restraining order, preliminary injunction, and expedited discovery, and for such other and further relief as the Court deems just and proper.

Date:   January 8, 2020
        New York, New York

Eric A. Savage, Esq. (ES4709)
Gary Moy, Esq. (GM7547)
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, New York  10022.3298
212.583.9600

*Attorneys for Plaintiff*
*General Mills, Inc.*

4842-4738-3216.3 040218.2427