UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GENERAL MILLS, INC.

Plaintiff,

v.

CHAMPION PETFOODS USA, INC, *et al*.,

Defendants.

No. 20-CV-181 (KMK)

<u>OPINION & ORDER</u>

---

<u>Appearances:</u>

Eric A. Savage, Esq.
Gary Moy, Esq.
Littler Mendelson, P.C.
New York, NY
*Counsel for Plaintiff*

Michael J. Sheehan, Esq.
Brian Scott Cousin, Esq.
Brian Mead, Esq.
Mark Douglas Meredith, Esq.
McDermott Will & Emery LLP
Chicago, IL; New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Plaintiff General Mills, Inc. ("Plaintiff") brings this Action against Defendants Champion

Petfoods, Inc. ("Champion") and Modestino Mele ("Mele") (jointly, "Defendants"), alleging

violations of state law and 18 U.S.C. § 1836 (the Defense of Trade Secrets Act ("DTSA")),

through breach of contract, tortious interference, unfair competition, misappropriation of trade

secrets, and unjust enrichment. (Dkt. No. 7.) On January 23, 2020, after Oral Argument, the

Court granted Plaintiff's Application for a Preliminary Injunction, stating its reasons on the

record. (Dkt. No. 39.) Before the Court are two Motions, both filed by Defendants, seeking a

*stay* of, and modifications to, the Preliminary Injunction.  (*See* Dkt. Nos. 42, 48.)  For the

following reasons, both Motions are denied.

## I.  Background

The Court assumes the Parties' familiarity with the factual record, the procedural history

and the Court's prior rulings.  Accordingly, the Court recounts the procedural background only

as relevant to the Motions currently under consideration.

On January 23, 2020, after Oral Argument, the Court granted Plaintiff's Application for a

Preliminary Injunction and partially granted Defendants' Motion to Compel Arbitration, stating

its reasons on the record.  (Dkt. No. 39; Jan. 23, 2020 Hr'g Tr. (Dkt. No. 47-4).)  The Court

specified that its grant of a Preliminary Injunction was based on Plaintiff's contract claim only,

and therefore the Court did not address the likelihood of success of Plaintiff's DTSA claims.

(Jan. 23, 2020 Hr'g Tr. 16.)  The Court enjoined Mele from working for Champion or disclosing

Plaintiff's confidential information, and, in light of an arbitration agreement assigning

arbitrability to the arbitrator, directed the Parties to arbitrate the issue of arbitrability.  (*See* Dkt.

Nos. 6, 10, 39).  On January 27, 2020, Defendants filed a Notice of Appeal.  (Dkt. No. 40.)

On January 28, 2020, Defendants filed a Pre-Motion Letter, accompanied by a

prospective Memorandum of Law ("Defs.' First Mem."), seeking to file an Expedited Motion to

Stay the Court's Preliminary Injunction Order Pending Appeal (the "First Motion").  (Dkt No.

42.)  In furtherance of this First Motion, Defendants argue that the Preliminary Injunction was

"improperly entered" because "the Court was without authority to consider Plaintiff's

application" in light of the arbitration agreement.  (*Id.*)  In the alternative, Defendants request

that the Court "modify its January 23 Order to make it clear that the Order will be dissolved

immediately once the matter is before an arbitrator." (*Id.*)  On January 31, 2020, Plaintiff filed a Response.  (Dkt. No. 46.)

On February 2, 2020, Defendants filed an additional Pre-Motion Letter, again accompanied by a prospective Memorandum of Law ("Defs.' Sec. Mem."), seeking to file a Motion to Modify the Preliminary Injunction (the "Second Motion").  (Dkt. No. 48.)  In this Second Motion, Defendants request that the Court modify "the scope of the [Preliminary Injunction] in order to permit Mele to work as head of sales for Champion . . . with responsibilities for all jurisdictions except for the United States and Canada." (*Id.*)  On February 4, 2020, Plaintiff filed a brief Letter Response, (Dkt. No. 50), and Defendants immediately filed a brief Letter Reply, (Dkt. No. 51).  On February 6, 2020, the Court held a Pre-Motion Conference, and Plaintiff was directed to file any further opposition to both Motions by February 11, 2020.  (*See* Dkt. (minute entry for February 6, 2020)).  Plaintiff then filed a lengthier Letter in Opposition on February 11, 2020, (Dkt. No. 55), and the next day, Defendants filed a Letter Reply, ("Defs.' Feb. 12, 2020 Letter" (Dkt. No. 56)).  On February 20, 2020, Defendants filed an additional Letter urging the Court "to rule on Defendants' request" without delay.  (Dkt. No. 57.)  On February 21, 2020, Plaintiff filed a Letter responding to Defendants' Letter of the day before.  ("Pl.'s Feb. 21, 2020 Letter" (Dkt. No. 58).)

## II.  Discussion

### A.  Standard of Review

Federal Rule of Civil Procedure 62(d) provides in pertinent part:

> While an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights.

Fed. R. Civ. P. 62(d).

In determining whether to issue a stay, courts in the Second Circuit consider the following four factors:

> (1) whether the movant will suffer irreparable injury absent a stay[;] (2) whether a party will suffer substantial injury if a stay is issued[;] (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal[;] and (4) the public interests that may be affected.

*Hirschfeld v. Bd. of Elections*, 984 F.2d 35, 39 (2d Cir. 1993) (citation and quotation marks omitted); *see also United States v. Visa U.S.A., Inc.*, No. 98-CV-7076, 2007 WL 2274866, at *1 (S.D.N.Y. Aug. 7, 2007) (same). In weighing these factors, courts should adopt "a sliding scale," such that "the necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other stay factors." *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) (alteration and some quotation marks omitted). For example, the "probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay. Simply stated, more of one excuses less of the other." *Id.* (citation, alteration, and quotation marks omitted); *see also Hayes v. City Univ. of N. Y.*, 503 F. Supp. 946, 962 (S.D.N.Y. 1980) (noting that the "[i]ssuance of a stay pending appeal is discretionary and equitable"), *aff'd* 648 F. 2d 110 (2d Cir. 1981).

A district court's power to modify or clarify a preliminary injunction once an appeal has been taken appears to be somewhat limited. Thus, although the plaint text of Rule 62(d) suggests that district courts retain the power to modify a preliminary injunction even after it has been appealed, "[t]his rule has been narrowly interpreted to allow district courts to grant only such relief as may be necessary to preserve the status quo pending an appeal where the consent of the court of appeals has not been obtained." *Vasile v. Dean Witter Reynolds, Inc.*, 205 F.3d 1327 (Table) (2d Cir. 2000) (citation omitted). This is so because once an appeal is taken, "jurisdiction passes to the appellate court." *Ideal Toy Corp. v. Sayco Doll Corp*., 302 F.2d 623,

625 (2d Cir. 1962).  Accordingly, where an appeal has been taken, "the appellant is not usually entitled as of right to present new evidence or argument to the trial court, which . . . will exercise jurisdiction only to preserve the status quo as of the time of appeal."  *Id.*; *see also Flatiron Health, Inc. v. Carson*, — F. Supp. 3d —, 2020 WL 416423, at *3 (S.D.N.Y. Jan. 27, 2020) (explaining that because a district court's "may not alter the posture of the case on appeal," clarifications of injunctions during the pendency of an appeal must be "consistent with the spirit of the original injunction such that they do not materially alter the status of the case on appeal." (citations and quotation marks omitted)).  Thus, district courts will modify and clarify a preliminary injunction pending appeal only to "ensure preservation of the status quo pending appeal."  *Broker Genius, Inc. v. Seat Scouts LLC*, No. 17-CV-08627, 2019 WL 5203474, at *3 (S.D.N.Y. Sept. 23, 2019) (citation and quotation marks omitted).  When, however, a request for clarification or modification is properly presented, "a court is charged with the exercise of the same discretion it exercised in granting or denying injunctive relief in the first place."  *Sierra Club v. U.S. Army Corps of Engineers*, 732 F.2d 253, 256 (2d Cir. 1984); *see also Dist. Attorney of New York Cty. v. Republic of Phil.*, 681 F. App'x 37, 41 (2d Cir. 2016) (explaining that "[t]he same standard applies to modification of an injunction" as to the initial granting of a preliminary injunction (citation omitted)).

B.  Analysis

Defendants' Letters and Memoranda advance a panoply of overlapping arguments in support of the both Motions.  The Court discusses each argument in turn.

### 1.  The Propriety of Preliminary Injunctions Pending Arbitration

Defendants first argue that the Court lacked jurisdiction to issue a preliminary injunction because, as the Court decided in its January 23, 2020 oral ruling, Plaintiff and Mele have a contract which assigns questions of arbitrability to an arbitrator.  This argument is without merit.

### a.  Circuit Precedent

Defendants' argument is at odds with the black-letter law of the Circuit.  The Second Circuit has repeatedly held that courts retain the power, and the responsibility, to consider applications for preliminary injunctions while a dispute is being arbitrated: "Where the parties have agreed to arbitrate a dispute, a district court has jurisdiction to issue a preliminary injunction to preserve the status quo pending arbitration.  The standard for such an injunction is the same as for preliminary injunctions generally."  *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 894–95 (2d Cir. 2015) (citations omitted); *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 238 (2d Cir. 2016) ("Generally, courts should consider the merits of a requested preliminary injunction even where the validity of the underlying claims will be determined in arbitration." (citation and quotation marks omitted)).  In the Second Circuit, this principle dates back decades, and district courts have been reversed where they have adopted the erroneous view that the "decision to refer the dispute to arbitration strip[s] the court of power to grant injunctive relief."  *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of N. Y.*, 749 F.2d 124, 125 (2d Cir. 1984); *see also Am. Exp. Fin. Advisors Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir. 1998) ("[T]he expectation of speedy arbitration does not absolve the district court of its responsibility to decide requests for preliminary injunctions on their merits." (citation omitted)).

Moreover, the Second Circuit has explained the clear rationale behind this settled principle.  "[P]ro-arbitration policies reflected in . . . Supreme Court decisions are furthered, not

weakened, by a rule permitting a district court to preserve the meaningfulness of the arbitration through a preliminary injunction.  Arbitration can become a 'hollow formality' if parties are able to alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute."  *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1053 (2d Cir. 1990) (citations omitted).  This rationale applies with particular force in the instant case.  Plaintiff seeks to enforce a contractual provision that bars Mele, a former senior executive with extensive knowledge of Plaintiff's strategic plans, operations, and other proprietary information, from working for its direct competitor for a single year.  Were the Court to decline enjoining Mele pending arbitration (first of arbitrability, and perhaps of the merits), much of the damage Plaintiff seeks to prevent will occur in the time it takes for the arbitrator to be appointed, consider the issues, and deliver a final ruling.  Such a delay would indeed render arbitration a "hollow formality."  *Blumenthal*, 910 F.2d at 1053 (quotation marks omitted).

### b.  The Effect of *Henry Schein*

In the face of clear Second Circuit precedent, Defendants argue that a recent Supreme Court case, *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524 (2019), (silently) overruled the longstanding law of the Second Circuit.  In particular, Defendants point to language in *Schein* declaring that once parties have agreed to submit a dispute to arbitration, a court "has no business weighing the merits of the grievance."  139 S. Ct. at 529 (citation and quotation marks omitted).

Defendants' invocation of *Henry Schein* fails for several reasons.  First, Defendants misapprehend the nature of a preliminary injunction.  The granting of a preliminary injunction is *not* a decision on the merits; rather "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of*

*Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Bay Ridge Diagnostic Lab., Inc. v. Dumpson*, 400 F. Supp. 1104, 1105 (E.D.N.Y. 1975) (explaining that a decision with respect to an application for a preliminary injunction "is not a decision on the merits in any respect"). Thus, for example, district courts freely confirm arbitration awards where state courts have previously denied preliminary injunctions in aid of arbitration. The reason is straightforward. "A court's decision that a party has not demonstrated a likelihood of success on the merits is not itself a decision on the merits." *TapImmune, Inc. v. Gardner*, No. 14-CV-6087, 2015 WL 4111881, at *6 (S.D.N.Y. July 8, 2015). The same distinction—between rulings on a preliminary injunction and those on the merits of an underlying claim—applies here.[1]

Defendants nevertheless argue that certain statements in *Henry Schein* should be interpreted broadly, not simply as precluding determinations on the merits pending arbitration, but even as precluding determinations of the *likelihood* of success on the merits pending arbitration. Such an interpretation cannot withstand scrutiny. First, as the Court observed during oral argument, the *Henry Schein* decision was "noticed to the world" as a narrow decision. (Jan. 23, 2020 Hr'g. Tr. 12.) Indeed, the *Henry Schein* Court defined the scope of its analysis precisely:

> Even when a contract delegates the arbitrability question to an arbitrator, some federal courts nonetheless will short-circuit the process and decide the arbitrability question themselves if the argument that the arbitration agreement applies to the particular dispute is "wholly groundless." The question presented in

---

[1] At Oral Argument, Defendants appeared to base their interpretation of *Henry Schein* in part on the fact that the underlying action in *Henry Schein* included a request for injunctive relief. Such an argument fails, however, because it ignores the critical distinction between permanent injunctions (which require a determination on the merits) and preliminary injunctions (which do not). *See Camenisch*, 451 U.S. at 396 (contrasting a motion for a permanent injunction, when "the parties will already have had their trial on the merits," with a preliminary injunction).

> this case is whether the 'wholly groundless' exception is consistent with the Federal Arbitration Act.

*Henry Schein,* 139 S. Ct. at 528.  Needless to say, the viability (or lack thereof) of a "wholly groundless exception" to the delegation of arbitrability has nothing to do with the propriety of preliminary injunctions pending arbitration.[2]

Moreover, nothing in briefing submitted to the Supreme Court in *Henry Schein*, nor its analysis of the issues before it, suggests that the Supreme Court considered—much less decided to overturn—the Second Circuit's longstanding rule in favor of preliminary injunction pending arbitration.  Nor is the Second Circuit unique in endorsing preliminary injunctions in such circumstances.  On the contrary, the substantial majority of Circuits do so.  *See Blumenthal*, 910 F.2d at 1052–53 (listing several circuits that "have endorsed a district court's power to issue an injunction pending arbitration" (collecting cases)); *see also Wine Not, Int'l v. 2atec, LLC*, No. 06-CV-117-T-23, 2006 WL 1766508, at *12 (M.D. Fla. June 26, 2006) (analyzing caselaw in each circuit and finding that, with the exception of the Eighth Circuit, all courts of appeals to address the issue have concluded that "notwithstanding a provision that all disputes will be settled by arbitration, a court has authority to issue a preliminary injunction pending arbitration"

---

[2] Recent Second Circuit precedent has also emphasized the narrow holding in *Henry Schein*.  In *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184 (2d Cir. 2019), *cert. denied,* 140 S. Ct. 256, 205 L. Ed. 2d 134 (2019), the Second Circuit rejected an expansive interpretation of *Henry Schein*—"that a court considering whether the arbitration agreement confers authority over arbitrability on the arbitrators may not consider whether the agreement calls for arbitration of the dispute."  *Id.* at 195.  As the Second Circuit explained, "[t]hat argument misunderstands the point of *Henry Schein*."  *Id.*  Rather, "[t]he point of the *Henry Schein* opinion was that, where the parties *have agreed* to submit arbitrability to arbitration, courts may not nullify that agreement on the basis that the claim of arbitrability is groundless.  The fault found by the Supreme Court in the lower court opinions was not that they failed to send the question of arbitrability to arbitrators.  It was that the lower court, applying what the Supreme Court called a 'wholly groundless exception,' failed to make a finding on whether the arbitration agreement called for sending arbitrability to the arbitrator."  *Id.* (emphasis in original).

(citation omitted)).  It strains credulity to imagine that the Supreme Court would overturn the established practice of the overwhelming majority of circuits without even saying so.  The Supreme Court "does not . . . hide elephants in mouseholes."  *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 468 (2001) (citations omitted).

Defendants' interpretation also leads to absurd results.  In *Henry Schein*, the Supreme Court considered the possibility that the absence of a "wholly groundless exception" might incentivize "frivolous motions to compel arbitration."  *Henry Schein*, 139 S. Ct. at 531 (quotation marks omitted).  Nevertheless, the Supreme Court explained that such concerns "overstate[] the potential problem" because "[a]rbitrators can efficiently dispose of frivolous cases by quickly ruling that a claim is not in fact arbitrable" and can "respond to frivolous arguments for arbitration by imposing fee-shifting and cost-shifting sanctions. *Id.* at 531.  The Supreme Court further explained, "[w]e are not aware that frivolous motions to compel arbitration have caused a substantial problem in those Circuits that have not recognized a 'wholly groundless' exception." *Id.*

The above analysis would make little sense if *Henry Schein* simultaneously eliminated preliminary injunctions pending arbitration.  First, the imposition of "fee-shifting and cost-shifting sanctions" are, by definition, inadequate in cases of "irreparable harm," i.e., the very cases in which preliminary injunctions are issued.  *Id.*  Second, one of the likely reasons that frivolous motions to compel arbitration have not "caused a substantial problem in those Circuits that have not recognized a 'wholly groundless' exception," *id.*, is that many of these same Circuits permit preliminary injunctions pending arbitration, *see Wine Not*, 2006 WL 1766508, at *12 (listing Circuits that permit these injunctions).  Such relief ensures that parties who file frivolous motions to compel arbitration do not benefit by inflicting irreparable harm in the

interim.  The Supreme Court would not invoke these Circuits' experience while simultaneously (and silently) eliminating the very tool that has made that experience possible.  And third, without the possibility of preliminary injunctions, groundless "motions to compel arbitration" would not simply be "frivolous;" *Henry Schein*, 139 S. Ct. at 531, they would, rather, be transformed into a frighteningly effective tactical tool for creating a *fait accompli*.  On Defendants' reading, a party with an irrelevant arbitrability provision would be free to inflict irreparable harm while filing a groundless motion for arbitration in a tactical scheme to preclude redress.  That party would then be entitled to reap the benefits of its bad faith, and the opposing party would be wholly without recourse.  This is not a plausible interpretation of *Henry Schein.*

Finally, decisions since *Henry Schein* by courts in the Second Circuit have continued to grant preliminary injunctions pending arbitration, and have continued to recognize *Benihana* and its progenitors as governing law.  *See, e.g.*, *Integro USA, Inc. v. Crain*, No. 19-CV-8752, 2019 WL 6030100, at *2 (S.D.N.Y. Nov. 14, 2019) (declining to enter a preliminary injunction, but explaining that "[b]y entering a preliminary injunction in aid of arbitration, a district court may . . . ensure that the parties get what they bargained for — a meaningful arbitration of the dispute" (citation and quotation marks omitted)); *Citizens Secs., Inc. v. Bender*, No. 19-CV-916, 2019 WL 3494397 *5 n.1 (N.D.N.Y. Aug. 1, 2019) (following *Benihana* in granting a temporary restraining order pending arbitration in a breach of contract and trade secrets misappropriation case, and noting that "the Court has jurisdiction to issue a temporary restraining order/preliminary injunction to preserve the status quo pending arbitration" (citation omitted)); *Leber v. Citigroup, Inc.*, No. 07-CV-9329, 2019 WL 1331313, at *3 (S.D.N.Y. Mar. 25, 2019) (declining to enter a preliminary injunction, but explaining that "[a] review of relevant Second Circuit case law reveals that district courts may indeed grant pre-arbitration relief . . . in the form

of an injunction to preserve the status quo when a dispute is subject to mandatory arbitration pursuant to the Federal Arbitration Act" (citations omitted)).  Thus, even if Defendants' interpretation of *Henry Schein* was plausible, these precedents would cut against adopting that interpretation.

Naturally, Defendants labor mightily to distinguish relevant precedent.  They therefore point out that the arbitration rules and contract at issue in *Bender* expressly permitted the parties to seek temporary relief from the federal courts.  (Defs.' Mem. 8.)  This argument misses the point.  First, as the Second Circuit has explained, such contractual provisions simply confirm an already extant, independent legal right.  *See Thorley*, 147 F.3d at 231 (explaining that because "courts do have the authority to consider the merits of requested injunctions [pending arbitration], a contractual provision stating that plaintiffs may seek such relief in a court of competent jurisdiction amply reaffirms what the law already directs.").  More importantly, however, it remains an unalterable fact that the district court in *Bender* invoked neither the details of the arbitration rules nor the particularities of the relevant contract in explaining its authority to grant a temporary restraining order pending arbitration.  Rather, the court explained the basis for its authority as follows:

> Although Plaintiff's claims against Defendant are subject to final disposition in arbitration, the Court has jurisdiction to issue a temporary restraining order/preliminary injunction to preserve the status quo pending arbitration.

*Bender*, 2019 WL 3494397, at *2 n.1 (citing *Benihana*, 784 F.3d at 894–95).  There is simply no way to read this statement other than an acknowledgment that *Benihana* remains good law.  Moreover, Defendants have advanced no arguments to explain away other clear statements from post-*Henry Schein* decisions indicating that preliminary injunctions are proper during the pendency of arbitration.

In the face of this apparent consensus within the Second Circuit, Defendants invoke only a summary decision from the District of Delaware. *See Vertiv Corp. v. Svo Building One, LLC*, No. 18-CV-01776, 2019 WL 1454953, at *2–3 (D. Del. Apr. 2, 2019) (explaining "I am entirely without authority to resolve whether I have authority to resolve Plaintiff's request for a preliminary injunction"). This Court harbors doubts about whether the *Vertiv* decision is consistent with Third Circuit precedent. *See Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806, 812 (3d Cir. 1989) ("[W]e do not construe [an arbitration] agreement as constituting a 'waiver' by either party of the right to seek preliminary injunctive relief necessary to prevent one party from unilaterally eviscerating the significance of the agreed-upon procedures . . . . [A] district court has the authority to grant injunctive relief in an arbitrable dispute, provided that the traditional prerequisites for such relief are satisfied."); *see also Scaba v. Jetsmarter, Inc.*, No. 18-CV-17262, 2019 WL 3947510, at *7 (D.N.J. Aug. 21, 2019) ("The [FAA] does not deprive the district court of the authority to grant interim relief in an arbitrable dispute, provided the court properly exercises its discretion in issuing the relief." (alteration in original) (citation and quotation marks omitted)). Regardless of the correctness of *Vertiv*, however, this Court is not obligated to follow it in the face of overwhelming competing authority, both within the Second Circuit (as discussed) and beyond. *See Optum, Inc. v. Smith*, 360 F. Supp. 3d 52, 56 (D. Mass. 2019) ("At least seven Courts of Appeals . . . have held that a district court has the inherent equitable power to issue a preliminary injunction to preserve the status quo pending arbitration in order to protect the ability of the arbitrator to provide meaningful relief if the plaintiff prevails in the arbitration . . . . The Supreme Court was not presented with this issue in *Schein*. There is, however, no reason to expect that it would disagree with the nearly uniform view of the Courts of Appeal that have addressed this issue . . . ." (collecting cases)), *appeal dismissed*, No. 19-

13

1149, 2019 WL 3564709 (1st Cir. Feb. 27, 2019).  This substantial consensus of authority offers

additional reason to reject Defendants' novel reading of *Henry Schein*.

<u>c.  Preserving the Status Quo</u>

Beyond reliance on *Henry Schein*, Defendants advance an additional argument for why

this Court lacked authority to issue the preliminary injunction.  In particular, Defendants argue

that (1) the only permissible preliminary injunctions pending arbitration are those that preserve

the status quo, and (2) that the Preliminary Injunction granted here changed the status quo and is

therefore impermissible.  (*See* Defs.' First Mem. 7 n.3, 12–13).

The Court rejects both elements of this argument.  First, Defendants do not, and cannot,

identify any authority holding that preliminary injunctions pending arbitration are so limited.

Certainly, several precedents emphasize that preservation of the status quo is an important goal

of many preliminary injunctions pending arbitration.  *See Benihana*, 784 F.3d at 894–95 ("[A]

district court has jurisdiction to issue a preliminary injunction to preserve the status quo pending

arbitration." (citation omitted)); *Blumenthal*, 910 F.2d at 1053 ("Arbitration can become a

'hollow formality' if parties are able to alter irreversibly the status quo before the arbitrators are

able to render a decision in the dispute." (citation omitted)).  That cases contain such language is

unsurprising given that the "typical preliminary injunction is prohibitory and generally seeks

only to maintain the status quo pending a trial on the merits."  *Tom Doherty Assocs., Inc. v.

Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (citation omitted).  These precedents, however,

provide no indication that preservation of status quo is a *requirement* for preliminary injunctions

pending arbitration.

Moreover, several precedents suggest precisely the opposite.  For example, in *Nicosia*,

the Second Circuit considered a request for a preliminary injunction pending arbitration where

14

the relief sought consisted of "remedial notices be sent to past purchasers" of certain products

and "measures be put in place to prevent Amazon from unwittingly selling" similar products.

834 F.3d at 238.  Needless to say, such a request is not simply a preservation of the status quo.

Nevertheless, the Second Circuit considered the requested relief on the merits, explaining that

"courts should consider the merits of a requested preliminary injunction even where the validity

of the underlying claims will be determined in arbitration."  *Id*. (citation and quotation marks

omitted).  Similarly, in *Thorley*, the Second Circuit directed the district court to consider a

preliminary injunction enjoining defendants from "soliciting their former clients in violation of

their contractual obligations" even though they had already been doing so for several weeks.  147

F.3d at 230–31.  That injunction is quite similar to the one entered here.  Accordingly, this Court

declines to adopt Defendants' novel limitation on courts' authority to grant preliminary relief

pending arbitration.[3]

Second, even if such a limitation was the law, the instant Preliminary Injunction would

still be appropriate.  At Oral Argument, the Court accepted *arguendo* that Plaintiff's requested

injunction was a "mandatory injunction," and found that Plaintiff had met the higher,

"substantial likelihood of success on the merits," threshold necessary for such injunctions.  *See*

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc*., 883 F.3d 32, 37 (2d Cir. 2018)

(explaining that "[b]ecause mandatory injunctions disrupt the status quo, a party seeking one

must meet a heightened legal standard by showing a clear or substantial likelihood of success on

---

[3] The Court also notes that, in the past, the Second Circuit has expressly declined to create special standards for preliminary injunctions pending arbitration.  *See Blumenthal*, 910 F.2d at 1054 ("A new 'rule of necessity' is unnecessary.  At present, the parties are free to litigate the necessity of an injunction under traditional principles.").  It is, therefore, unlikely to do so here.

the merits" (citation and quotation marks omitted)).[4]  The Court did not, however, *decide* that the requested injunction was a disruption on the status quo.  Here, on consideration of the issue, the Court concludes that the instant preliminary injunction, in fact, *preserves* the status quo.

The Second Circuit has repeatedly explained that, for purposes of granting a preliminary injunction, the "status quo" is not simply the status quo in the moment before relief is granted. Rather, it refers to "the last actual, peaceable uncontested status which preceded the pending controversy." *Id.* at 37 (citation and quotation marks omitted).  In other words, "[t]he 'status quo' in preliminary-injunction parlance is really a 'status quo ante.'  This special 'ante' formulation of the status quo in the realm of equities shuts out defendants seeking shelter under a current 'status quo' precipitated by their wrongdoing."  *Id.* n.5 (citations omitted); *see also Mastrio v. Sebelius*, 768 F.3d 116, 120–21 (2d Cir. 2014) ("Preserving the status quo is not confined to ordering the parties to do nothing: it may require parties to take action.").[5]

---

[4] As the Court explained in its oral ruling: "Now, a plaintiff seeking a preliminary injunction has to establish . . . irreparable harm and a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary injunctive relief. And then, of course, there is the mandatory injunction test where GMI has to establish a substantial likelihood of success on the merits. And that is the test that certainly should have been applied and was applied.  In the TRO context, you could argue that the status quo is the TRO, but I will apply the higher standard here because it's the prudent thing to do."  (Jan. 23, 2020 Hr'g. Tr. 14.)

[5] The Court acknowledges, of course, that these standards are not easily applied: "The distinction between mandatory and prohibitory injunctions is not without ambiguities or critics. Determining whether the status quo is to be maintained or upset has led to distinctions that are more semantic than substantive . . . .  A plaintiff's view of the status quo is the situation that would prevail if its version of the contract were performed.  A defendant's view of the status quo is its continued failure to perform as the plaintiff desires." *Tom Doherty Assocs.*, 60 F.3d at 34 (citations, alteration, and quotation marks omitted).

Under these legal standards, Defendants' characterization of the instant Injunction is incorrect.  Defendants have indeed asserted, and Plaintiff does not dispute, that Mele began "active employment with Champion on December 2, 2019."  (Def. Mele's Decl. in Supp. of Mot. To Stay ("Mele Decl.") ¶ 6 (Dkt. No. 22).)  And to be sure, Plaintiff did not seek a temporary restraining order (and preliminary injunction) until January 9, 2020.  (*See* Dkt. No. 1.)  However, Plaintiff wrote to Defendants as far back as November 12, 2019, informing them "of Mr. Mele's non-compete and confidentiality obligation to General Mills" and expressing concern that "it currently appears to us that it would be impossible for Mr. Mele to perform the role of Chief Customer Officer for Champion Petfoods without violating his agreements with and obligations to General Mills."  (Pl.'s Decl. in Supp. of Mot. for Preliminary Injunction ("Pl.'s Decl") Ex. A (Dkt. No. 18-1).)  Moreover, Mele's position was not publicly announced nor its details explained until January 8, 2020, (Dkt. No. 18-2), the day before Plaintiff filed suit and sought interim relief.  In light of these facts, it can hardly be said that the six weeks in which Mele was employed were an "actual, peaceable uncontested status which preceded the pending controversy."  *N. Am. Soccer League*, 883 F.3d at 37 (citation and quotation marks omitted).  On the contrary, the "controversy" was already well under way at least as far back as Plaintiff's November 12, 2019 letter of protest.  Thus, because the relevant "status quo" is "the situation that existed between the parties immediately prior to the events that precipitated the dispute," *Asa v. Pictometry Intern. Corp.*, 757 F. Supp. 2d 238, 243 (W.D.N.Y. 2010), the proper status quo ante is the period prior to Mele's employment.[6]

---

[6] To the extent that Defendants argue Plaintiff ceded the "status quo" by delaying the filing of its Complaint and Motion until January 9, 2020, the Court rejects that argument because the delay was both brief and explained.  *See* Section 3, *infra.*

Moreover, characterizing the instant Injunction as a preservation of the status quo comports with the general approach of district courts in similar cases. Indeed, "courts in this Circuit routinely apply the ordinary standard [rather than the heightened, mandatory injunction standard] when deciding whether to issue an injunction in connection with an employment contract." *Solomon Agency Corp. v. Choi*, No. 16-CV-353, 2016 WL 3257006, at *2 (E.D.N.Y. May 16, 2016); *see also New Horizons Educ. Corp. v. Krolak Tech. Mgmt. of Syracuse, LLC*, No. 18-CV-1223, 2018 WL 5253070, at *6 (N.D.N.Y. Oct. 22, 2018) (characterizing the plaintiffs' request for an order directing the defendants to stop using plaintiffs' trademarks and enforce the parties agreements as a request for traditional, "prohibitory relief"); *Devos, Ltd. v. Record*, No. 15-CV-6916, 2015 WL 9593616, at *9 (E.D.N.Y. Dec. 24, 2015) (granting a preliminary injunction based on the traditional (rather than heightened) standard even though defendants were already competing with, and soliciting business from customers of, the plaintiff). The logic behind this approach is simple: doing otherwise would permit defendants to "seek[] shelter under a current 'status quo' precipitated by their wrongdoing." *N. Am. Soccer League*, 883 F.3d at 37 n.5. The same principle applies here. Accordingly, even were preliminary relief pending arbitration to be limited to orders preserving the status quo, the Preliminary Injunction entered here would be proper.

### 2. The Enforceability of the Contract and the Balance of Harms

Defendants also briefly argue that while Defendants would suffer "irreparable harm" absent a temporary stay, Plaintiff "will not be substantially injured by a temporary stay." (Defs.' First Mem. 10–12.) In particular, Defendants note that "the current Order . . . restricts [Mele's] ability to earn a living and provide for his family," (*id.* 10); and that "Defendants have already

put in place voluntary restrictions on the kind of work activity Mele will be permitted" that will sufficiently protect Plaintiff's "legitimate" interests, (*id.* 11).

In large part, these arguments rehash those that were already before the Court when it considered, and granted, Plaintiff's Application for a Preliminary Injunction.  The Court recognizes, of course, the hardship associated with enforcement of a non-compete obligation. However, Plaintiff was "free to accept employment in a non-competitive industry," *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-CV-4819, 2018 WL 6786338, at *27 (S.D.N.Y. Oct. 25, 2018) (citation and quotation marks omitted); it was his own decision to accept employment in precisely the industry in which he worked, and with a direct competitor of his previous employer.  Moreover, courts regularly enforce such obligations when freely entered into and when limited to a single year.  *See id.* (explaining that "Delaware courts have consistently held that two-year covenants not to compete are reasonable in duration," and that where Plaintiff's business is nationwide, "covenants not to compete and not to solicit without a geographic scope may be enforced" (citation omitted)); *Cardwell v. Thermo Fischer Sci.*, No. 09-CV-7809, 2010 WL 3825711, at *7 (S.D.N.Y. Sept. 23, 2010) (enforcing a one-year non-compete agreement against a project manager employed for over four years); *Weichert Co. of Pa. v. Young*, No. C.A. 2223-VCL, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007) ("Covenants of two-years' duration are consistently held to be reasonable.  Those few cases holding that two years is an unreasonable duration involve unskilled workers who received no specialized training—clearly not the type of employee in this case." (citations and footnotes omitted)).[7]

---

[7] Both Plaintiff and Defendants have litigated the case on the assumption that Plaintiff's contract claims should be analyzed under Delaware law because at least some of Plaintiff's and Mele's contractual agreements incorporate Delaware law.  (*See* Pl.'s Mem of Law in Supp. of Mot. for Preliminary Injunction (Dkt. No. 14) 11; Defs.' Mem. of Law in Opp'n. to Mot. for Preliminary Injunction (Dkt. No. 31) 15 n.5).  Accordingly, the Court applies Delaware law on

Moreover, as this Court discussed in its oral ruling, numerous courts, both in New York

and Delaware, have found irreparable harm where a senior executive with proprietary knowledge

of a company's inner workings violates a non-compete agreement.  For example, in *Sensus USA,*

*Inc. v. Franklin*, No. 15-CV-742, 2016 WL 1466488 (D. Del. Apr. 14, 2016), the court reasoned,

> [The defendant's] employment history with [the plaintiff] supports a finding of
> irreparable harm.  The record indicates that [the defendant] has in-depth knowledge
> regarding several key elements of [the plaintiff's] business operations.  As a former
> executive . . ., [the defendant] is intimately familiar with [the plaintiff's proprietary
> system.]  The Parties recognize that [the defendant] worked on some of [the
> plaintiff's] biggest projects, . . . [and] both acknowledge [the defendant's]
> familiarity with [the plaintiff's] internal policies regarding pricing and contract
> negotiation . . . .  [The plaintiff] is actively competing directly with [the defendant's
> new employer] for some contracts . . . .  Due to [the defendant's history] with [the
> plaintiff], as well as his former and prospective relationships with [his new
> employer], it is likely that [the plaintiff] will suffer irreparable harm if [the
> defendant] is not enjoined.

2016 WL 1466488, at *8; *see also Estee Lauder Cos. Inc. v. Batra*, 430 F. Supp. 2d 158, 176

(S.D.N.Y. 2006) (finding that the plaintiff established irreparable harm where that defendant

with knowledge of trade secrets violated a restrictive covenant and was presently working for a

direct competitor); *Tristate Courier & Carriage, Inc. v. Berryman*, No. C.A. 20574, 2004 WL

835886, at *13 n.147 (Del. Ch. Apr. 15, 2004) ("The harms resulting from competition by

someone bound by a noncompetition agreement are frequently found to be irreparable." (citation

omitted)); *cf. Tasktop Techs. US Inc. v. McGowan*, No. 18-CV-1075, 2018 WL 4938570, at *7

(D. Del. Oct. 11, 2018) (holding that a non-compete was likely unenforceable because the

defendant lacked "'in-depth knowledge' of [the plaintiff's] business operations" and was not

"'intimately familiar' with [the plaintiff's] proprietary information." (citation omitted)).

---

this issue.  *See Texaco A/S (Denmark) v. Commercial Ins. Co. of Newark, NJ*, 160 F.3d 124, 128
(2d Cir. 1998) "[W]here the parties have agreed to the application of the forum law, their consent
concludes the choice of law inquiry.")

While Defendants' briefing repeatedly seeks to obscure, or preclude consideration of, the harms associated with Mele's breach of his agreement, such arguments lack merit. For example, Defendants assert that "the threat of inevitable disclosure, by itself, is not a basis under either federal law or Delaware law to keep an individual out of a job." (*See* Defs.' Feb. 12, 2020 Letter at 3). Similarly, Defendants argue that any harms associated with such disclosures should not be considered because they are "purely speculative." (Defs.' First Mem. 11.)

These statements are misleading, both because they conflate contractual obligations and the DTSA, and because they misrepresent Delaware law. It is true that the DTSA does not authorize injunctions to "prevent a person from entering into an employment relationship," and only authorizes injunctions that place conditions on employment where the injunction is based on "evidence of threatened misappropriation and not merely on the information the person knows." 18 U.S.C. § 1836(b)(3). But the instant Preliminary Injunction was not granted based on Plaintiff's DTSA claim; it was granted based on Plaintiff's contract claims. (*See* Jan. 23, 2020 Hr'g Tr. 16.) As the caselaw discussed above makes abundantly clear, when addressing violations of non-compete agreements, courts—including in Delaware—commonly consider the harm arising from the likely, even if inadvertent, misuse of confidential information or customer relationships. *See Capstone Logistics*, 2018 WL 6786338, at *27 (explaining that "restrictive covenants on 'key employees' with proprietary information serve legitimate business interests" (citation omitted)); *Sensus*, 2016 WL 1466488 at *8 ("Due to [the defendant's] history with [the plaintiff], as well as his former and prospective relationships with [his new employer], it is likely that [the plaintiff] will suffer irreparable harm if [the defendant] is not enjoined."); suffer irreparable harm if [the defendant] is not enjoined."); *Estee Lauder*, 430 F. Supp. 2d at 176 ("[E]ven assuming the best of good faith, it is doubtful whether the defendant could completely

divorce his knowledge of the trade secrets from any work he might engage in." (alterations, citation and quotation marks omitted)).[8]

### 3. The Impact of Plaintiff's Delay in Filing Suit

Defendants also argue, as they have before, that Plaintiff's claim of substantial harm is undermined by the fact that Mele "had already been working at Champion for five weeks with [voluntary] restrictions in place prior" to the entry of a temporary restraining order.  (Defs,' Mem. 11.).  To be sure, delays in seeking relief may sometimes undermine a party's claims of irreparable harm.  *See Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) ("We have found delays of as little as ten weeks sufficient to defeat the presumption of irreparable harm. . . . ." (citation omitted)).  Generally, however, such delays are significantly longer than the six-week delay here.  *See Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 439 (E.D.N.Y. 2013) (noting that "months-long delays in seeking preliminary injunctions have repeatedly been held by courts in the Second Circuit to undercut the sense of urgency accompanying a motion for preliminary relief" (citations omitted)); *Habitat for Horses v. Salazar*, 745 F. Supp. 2d 438, 449 (S.D.N.Y. 2010) ("[N]one of the cases relied on by [the defendant] found that a delay of as few as thirty days can negate a finding of irreparable harm." (citations omitted)); *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (delay of nine months negates a presumption of irreparable harm).

---

[8] Defendants claim that "the threat of inevitable disclosure, by itself, is not a basis under . . . Delaware law to keep an individual out of a job" is somewhat mystifying.  Insofar as Defendants seek to describe independent actions under Delaware law for the theft of trade secrets, the statement is irrelevant to the instant claim, which sounds in *contract*.  Insofar as Defendants suggest that the threat of inevitable disclosure is not sufficient harm in a breach of contract case, the assertion is belied by the clear caselaw discussed above.  *See e.g., Sensus*, 2016 WL 1466488 at *8.  While Defendants purport to rely on *W.L. Gore & Assocs., Inc. v. Wu*, No. CIV.A. 263-N, 2006 WL 2692584, at *17–18. (Del. Ch. Sept. 15, 2006), *aff'd,* 918 A.2d 1171 (Del. 2007)), nothing in that case even remotely supports the asserted statement.

Moreover, courts have consistently held that when a brief delay is caused by "good faith efforts to investigate" the violation, such delay is not fatal to a claim of irreparable harm. *Tough Traveler*, 60 F.3d at 968; *see also Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 333 (S.D.N.Y. 2011) (noting that a "plaintiff's making good faith efforts to investigate" may justify delays in seeking relief (citation and quotation marks omitted)).  Here, Plaintiff has explained that while it "knew that Mr. Mele had been planning to or had, in fact, gone to Champion Petfoods[, Plaintiff] did not know what he was doing there and had not been given any details about his job." (Jan. 9, 2020 Hr'g. Tr. 4.)  Indeed, the very day Mele's employment was announced publicly and described in any detail, Plaintiff's counsel notified opposing counsel that he would be seeking a temporary restraining order the following day.  (*Id*. at 5.)  Accordingly, Plaintiff's brief delay between December 2, 2019 and January 9, 2020 indicates responsibility, not a lack of urgency, on the part of Plaintiff.  The Court therefore concludes that Plaintiff's claim of irreparable harm is not undermined by the brief period in which Mele was employed by Champion prior to Plaintiff's seeking relief.

### 4.  Purported "Credibility Determinations"

In a brief footnote, Defendants argue that "the Court impermissibly made findings on the merits, at least with respect to the credibility of Plaintiff's claims . . . concerning the risk of disclosure and misappropriation of its confidential trade secret information . . . despite the fact that [Defendants'] declarations were uncontroverted on the record before the Court."  (Defs.' First Mem. 5 n.2.)  This is incorrect.  As the Court emphasized repeatedly in its ruling, it had no need to evaluate—let alone decide—the merits of Plaintiff's DTSA claim.  (Jan. 23, 2020 Hr'g. Tr. 16.)  Rather, the Court determined that Plaintiff was overwhelmingly likely to succeed on its

contract claims, and that the imminent harm from Defendants' conduct with respect to those claims would be irreparable absent preliminary relief.

To be sure, part of that harm is based on the likelihood (if not inevitability) that Mele's intimate knowledge of Plaintiff's confidential information would influence (even inadvertently) his decisions as a Champion senior executive—and that the influence would operate to Champion's unfair advantage and Plaintiff's unfair detriment.  But for the purposes of a preliminary injunction, Plaintiff need not establish whether such conduct amounts to "disclosure and misappropriation" of confidential information under DTSA, nor whether Mele has already ventured beyond such conduct, or even if he is likely to do so.  It is enough that Plaintiff has established that Mele (with Champion's willing assistance) breached his contract with Plaintiff, and that that the harm from allowing the breach to continue is likely to be irreparable. Defendants do not, and indeed cannot, dispute this.

Defendants also suggest that the Court "committed further error" by failing "to hold[] an evidentiary hearing to weigh the credibility of the parties' respective witnesses."  (Defs.' Mem. 5 n.2.)  This is sheer shamelessness.  Defendants declined to make Defendant Mele available for a deposition in advance of the Court's January 23, 2020 proceeding (despite a Court Order), and then sought a protective order preventing his deposition, stating to the Court, "Defendants do not propose any testimony or the presentation of additional evidence at the PI Hearing other than what has already been submitted to the Court."  (Dkt. No. 29.)  Shortly thereafter, Defendants again represented to the Court "there is no need for Mr. Mele's deposition – or for any discovery – to take place prior to the hearing on January 23, 2020."  (Dkt. No. 33.)  Of course, the Court did not make any credibility determinations in deciding to grant the Preliminary Injunction.  But for Defendants to resist the taking of depositions and discovery, oppose the use of witnesses,

represent to the Court that the factual issues material to the granting of a preliminary injunction were not in dispute, and *then* complain about the lack of an evidentiary hearing is not a winning argument.

### 5.  The Public Interest

Defendants' argument that the public interest weighs in favor of granting a stay is wholly without merit.  Courts routinely hold "[t]here is undoubtedly a public interest in enforcing valid contracts including such restrictive covenants as they may contain."  *HRB Res. LLC v. Schon*, No. 19-CV-339, 2019 WL 4015256, at *3 (N.D.N.Y. Apr. 25, 2019); *see also Empower Energies, Inc. v. SolarBlue, LLC*, No. 16-CV-3220, 2016 WL 5338555, at *13 (S.D.N.Y. Sept. 23, 2016) ("There is a well-recognized public interest in enforcing contracts . . . ." (citations omitted)); *Sensus*, 2016 WL 1466488, at *8 ("It is in the interest of the public to hold parties to the very terms upon which they negotiated and agreed to be bound.").

Defendants, by contrast, can point to no competing public interest.  Instead, Defendants recycle two authorities, neither of which is on point.  (Defs.' First Mem. 11.)  The first, a decision from the District of Delaware, simply explains that a particular contract was "not the kind of agreement that was entered into by two competent, business-savvy parties," because the defendant was "far from an experienced business professional" who began working with a "comparatively low starting salary of $40,000."  *Tasktop*, 2018 WL 4938570, at *7 (citation, alteration, and quotation marks omitted).  Defendants do not even try to argue that Mele was similarly situated.  Second, Defendants invoke the general public policy in favor of arbitration, *see e.g., Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (explaining that the FAA requires courts to enforce arbitration agreements "according to their terms" (citation omitted)).  That public policy, however, is not harmed by the issuing of a preliminary injunction pending

arbitration.  The opposite is true, as noted above.  *See supra* Section 1; *see also Blumenthal*, 910 F.2d at 1053.

6. Requested Clarifications and Modifications

Defendants' First Motion concludes by requesting that the Court "clarify its Order" in two respects: (1) by "clarifying" that the Preliminary Injunction "remains in place only until the [P]arties' disputes are presented to the AAA for resolution[,] and not, as the Order could be read to mean, until the arbitrator renders a decision on the arbitrability of the dispute"; and (2) by "clarifying" that the Preliminary Injunction "restricts Mele only from using or disclosing any of GMI's confidential trade secret information, and he is not otherwise restricted from working at Champion entirely."  (Defs.' First Mem. 12.)  Defendants' Second Motion adds a third request: that the Court "modify the scope of scope of the restraint to permit Mele to work as head of sales for Champion . . . with responsibilities for all jurisdictions except for the United States and Canada."  (Defs.' Sec. Mem. 1.)  The Court address Defendants' first request (regarding the duration of the Preliminary Injunction), and then turns to their latter two requests (regarding the scope of the Preliminary Injunction).

a.  The Duration of the Preliminary Injunction

Defendants argue that Preliminary Injunction may "remain[] in place only until the [P]arties' disputes are presented to the AAA for resolution," because anything further would exceed the Court's power.  The argument is both illogical and unsupported by relevant authority.

As explained at length in Section 1 of this Opinion, longstanding precedent permits (indeed compels) district courts to consider motions for preliminary relief even where an arbitrator will consider the merits of an underlying dispute.  *See Nicosia*, 834 F.3d at 238 ("Generally, courts should consider the merits of a requested preliminary injunction even where

26

the validity of the underlying claims will be determined in arbitration.").  Moreover, it is commonplace for such preliminary injunctions to continue throughout the pendency of the arbitration proceedings.  *See, e.g.*, *Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 620 (S.D.N.Y. 2010) (granting "a preliminary injunction enjoining [the defendant] from terminating [an a]greement pending the conclusion of arbitration proceedings").  In fact, sometimes, preliminary injunctions are even issued during the course of such arbitration proceedings.  *See Arnold Chase Family, LLC v. UBS AG*, No. 08-CV-581, 2008 WL 3089484, at *3 (D. Conn. Aug. 4, 2008) ("[A]t least in the Second Circuit, courts have historically entertained requests for provisional remedies during the pendency of arbitrations").

Here, of course, neither this Court nor an arbitrator has yet determined *whether* the arbitrator will even decide the underlying claims.  On the contrary, in its January 23, 2020 ruling, this Court found only that the issue of arbitrability—not the underlying claims themselves—had been assigned to the arbitrator.  (*See* Jan. 23, 2020 Hr'g. Tr. 10–13.)  Whether the underlying claims will be decided by the Court or by the arbitrator remains, at present, an undecided question.  If, however, the arbitrator decides that it, rather than the Court, has jurisdiction over the underlying dispute (a conclusion which is far from obvious), the Parties will simply be left in precisely the situation governed by the line of cases from *Roso-Lino* to *Benihana*: awaiting the results of an arbitration on the merits.  The continuation of a preliminary injunction during the course of such arbitration proceedings on the merits would, therefore, be entirely natural.  *See Benihana,* 784 F.3d 902 (affirming the grant of a preliminary injunction enjoining defendant from selling certain items "pending *resolution* of the arbitration").  It is also intuitive.  After all, the purpose of such preliminary injunctions (like all preliminary injunctions) is to prevent irreparable harm pending resolution of the dispute on the merits.  *See Blumenthal,* 910 F.2d at

27

1053.  It would make little sense to dissolve a Preliminary Injunction and permit that same

irreparable harm simply because an arbitrator has *begun* to consider the merits.

      In support of their request to limit the duration of the Preliminary Injunction, Defendants

invoke a First Circuit case, *Next Step Med. v. Johnson & Johnson Int'l*.  In that case, the First

Circuit explained that "where preliminary relief is for the arbitrator, a district court retains power

[only] to grant an *interim* preliminary injunction . . . for the interval needed to resort to the

arbitrator—that is, for the period between the time the district court orders arbitration and the

time the arbitrator is set up and able to offer interim relief itself."  619 F. 3d 67, 70 (1st Cir.

2010) (emphasis in original).  There are, however, several problems with Defendants' reliance on

this case here.  First, it is far from clear that, in the instant dispute, "preliminary relief is for the

arbitrator."  Indeed, at the present moment, all that is before the arbitrator is the issue of

arbitrability.  Thus, the arbitrator may well decide that the underlying claims are not covered by

the relevant arbitration agreement.  Moreover, even if the arbitrator were to assert jurisdiction

over the merits, it may (and likely will) decide that it has no authority to offer preliminary relief

because the Parties' arbitration clause did not adopt the AAA Optional Rules for Emergency

Measures of Protection.  (*See* Pl.'s Feb. 21 Letter.)  Thus, even if this Court were to adopt the

First Circuit rule, it would not apply here.

      Second, the Second Circuit has apparently already rejected the First Circuit's limitation

on injunctive relief pending arbitration.  In *Thorley,* for example, the district court declined to

consider offering preliminary relief on the grounds that the parties could "just as quickly obtain

the same temporary equitable relief from the arbitrator as from a court."  *See Thorley*, 147 F.3d

at 230–31.  The Second Circuit reversed, explaining that "the expectation of speedy arbitration

does not absolve the district court of its responsibility to decide requests for preliminary

injunctions on their merits." (citation omitted)); *see also Disc. Trophy & Co. v. Plastic Dress-Up Co.*, No. 03-CV-2167, 2004 WL 350477, at *8 (D. Conn. Feb. 19, 2004) ("[T]he Court has both the power and duty to entertain a motion for a preliminary injunction pending the results in the arbitration . . . even though, as is the case here, the parties are entitled under the rules of the arbitral tribunal they have chosen to seek *pendente lite* relief directly from the arbitrator.")

Accordingly, the Court declines to modify the Preliminary Injunction Order, and the instant Preliminary Injunction shall remain in effect until resolution of the merits of the dispute, either by the arbitrator or this Court.[9]

### b. The Scope of the Preliminary Injunction

As a threshold matter, because Defendants have already taken an appeal, the Court currently lacks jurisdiction with respect to both of Defendants' requests to modify the scope of the Preliminary Injunction. While "absent an appeal, a district court has complete power over its interlocutory orders," where an appeal has taken, a district court may act "only to preserve the status quo as of the time of appeal." *Ideal Toy*, 302 F.2d at 625. Here, Defendants filed their notice of appeal prior even to seeking a stay from this Court. (*See* Dkt. No. 40.) Therefore "jurisdiction [has] passe[d] to the appellate court," and this Court retains power only to clarify and preserve the status quo, not to substantively modify its order. *Ideal Toy*, 302 F.2d at 625; *see also Flatiron Health*, 2020 WL 416423, at *3 (explaining that a district court "may not alter the posture of the case on appeal"). Defendants' requests that Mele be permitted to work for Champion, either generally (as in Defendants' First Motion) or by coordinating sales outside of North America (as in Defendants' Second Motion), is wholly inconsistent with the text and spirit

---

[9] Of course, the Preliminary Injunction shall not extend, in any event, beyond August 1, 2020, when Mele's relevant contractual obligation expires.

of the Preliminary Injunction Order.  (*See* Dkt. Nos. 6, 10 (enjoining Mele from working for Champion and Champion from employing Mele) and 39 (adopting and converting the restraints in Dkt. No. 6 into a Preliminary Injunction)).  Accordingly, the Court is precluded from granting the present appeal.

In the alternative, Defendants' requests to narrow the scope of the Preliminary Injunction are rejected on the merits as well.  Defendants' first request, that Mele be permitted to work for Champion while being restrained "only from using or disclosing any of GMI's confidential trade secret information," (Defs.' First Mem. 12), wholly ignores the existence of Mele's contractual non-compete obligations.  It therefore fails to prevent the irreparable harm associated with Mele's violation of those obligations.  *See Sensus*, 2016 WL 1466488 at *8 (finding irreparable harm based on the violation of a non-compete obligation).  As this Court has explained at length above, the instant contract prevents more than the conscious misappropriation of what Mele understands to be confidential trade information.  It also protects Plaintiff from unfair competition generated by a direct competitor's hiring of Plaintiff's former senior executive while that executive retains current, proprietary knowledge of Plaintiff's operations and strategies. Indeed, even the best-intentioned former senior executive will likely fail in "completely divorc[ing] his knowledge of . . . trade secrets from . . . work he might engage in."  *Estee Lauder*, 430 F. Supp. 2d at 176 (citation, alteration, and quotation marks omitted).

Although slightly more sensible than their first request, Defendants' second requested modification is similarly inadequate.  Defendants argue that Mele should be permitted to work as Champion's head of sales "with responsibilities for all jurisdictions except for the United States and Canada" because Plaintiff's subsidiary (for which Mele previously worked) is now limiting

operations to the United States and Canada only. (Defs.' Sec. Mem. 1.) Thus, by working in this confined role, Defendants argue, Mele would not be directly competing with Plaintiff. (*Id.*)

The argument fails, however, because Defendants cannot explain how they would (or could) prevent Mele's conduct in this role from assisting, even indirectly, Champion's competitive efforts against Plaintiff in North America. Unless Defendants propose to set up a perpetual firewall that bars American employees from ever accessing Mele's coming year of work, communicating with Mele about this work, or absorbing the knowledge gleaned from this work into its domestic arm, Defendants' proposal is simply inadequate to ameliorate the concerns that Mele's agreement was designed to address. Of course, such a firewall is difficult to imagine, and likely impossible to implement.

The bottom line is this: a one-year restriction barring a senior executive from working for a direct competitor on the very product categories on which he previously worked is a sensible and reasonable restriction designed to prevent irreparable harm. Plaintiff appears to have bargained for, and received, Mele's commitment to abide by such a restriction. Defendants' proposals do not, and cannot, adequately substitute for that restriction. Accordingly, the Court declines to modify the scope of its Preliminary Injunction.

## III. Conclusion

For the foregoing reasons, Defendants' Motion to Stay the Court's Preliminary Injunction Order Pending Appeal and their Motion to Modify the Preliminary Injunction are both DENIED.

SO ORDERED.

DATED:     February 26, 2020
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

31